```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
MIGDALIA HERNANDEZ o/b/o
      BRIAN SAEZ-HERNANDEZ,

                    Plaintiffs,              05-CV-6236T

v.                                           DECISION
                                             and ORDER
JO ANNE BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

                    Defendant.
_____
```

## INTRODUCTION

Plaintiff Migdalia Hernandez ("Hernandez" or "plaintiff") brings this action on behalf of her son Brian Saez-Hernandez, ("Brian"), seeking reversal of the Commissioner's final decision denying her son's application for childhood disability benefits under Title XVI of the Social Security Act. Specifically, the plaintiff alleges that her son suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), bipolar disorder with depressed mood, and borderline IQ, all of which render him disabled for purposes of receiving Supplemental Security Income ("SSI") benefits.

By motion dated January 24, 2006, the Commissioner of Social Security ("Commissioner") seeks judgment on the pleadings on grounds that her determination is supported by substantial evidence contained in the record. By cross-motion dated November 26, 2005, plaintiff moves for judgment in her favor on grounds that the

Commissioner's determination was against the weight of the evidence.

For the reasons set forth below, I find that the Commissioner's determination is not supported by substantial evidence contained in the record. Rather, the record reveals that Brian suffers from marked limitations in two areas of functioning, and therefore is disabled under the Social Security rules. For the reasons that follow, I therefore deny the Commissioner's motion for judgment on the pleadings, and grant the plaintiff's cross-motion for judgment on the pleadings.

## PROCEDURAL HISTORY

Plaintiff Migdalia Hernandez is the mother of Brian Saez-Hernandez, born on October 11, 1991.[1] (T. 41-46). On May 28, 2002, the plaintiff filed an application for Supplemental Social Security Income benefits on behalf of Brian, who at the time was approximately 10 years old. (T. 41-46). The plaintiff contended that her son suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), bipolar disorder with depressed mood, and borderline IQ. (T. 60, 143). The plaintiff alleged the onset of her son's disability was April 1, 1994. Id. On September 24, 2002, Brian's application was denied. (T. 32-35). Hernandez on her son's behalf filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (T. 36). On July 29, 2004, a hearing was held in

---

[1] Citations abbreviated by "T" refer to the Transcript of the Administrative Record submitted to the Court as part of defendant's Answer.

Rochester, New York before ALJ Steven Slahta. (209-228). Hernandez and her son Brian appeared and testified at the hearing and were represented by Michael L. Bonsor, Esq., of the Public Interest Law Office of Rochester. Id. On September 23, 2004, the ALJ issued an unfavorable decision, finding Brian not disabled. (T. 11-22). This decision became the final decision of the Commissioner on March 10, 2005, when the Appeals Council denied a request for a review. (T. 4-6).[2] On May 9, 2005, Hernandez filed this action.

## BACKGROUND

A.  Family Information and Hearing Testimony

Brian Saez-Hernandez ("Brian") was born on October 11, 1991, and was twelve years old at the time of the ALJ's decision. (T. 16, 41).  In a questionnaire about Brian's ability to function, his mother, Hernandez stated that he had no problems hearing, seeing, or communicating but that he had behavioral problems and was very hyper. (T. 50-51, 133). She maintained that he did not get along with other kids, was very demanding, threw things, pushed others, and did dangerous things such as play with knives and matches and throw rocks. (T. 133). She maintained that Brian could write a simple story and print some letters but that he could not read and understand simple sentences or stories in books or magazines, write

---

[2] It should be noted that Hernandez filed a new and second application in June 2005, which was granted. Brian is currently receiving SSI disability benefits based on his ADHD and bipolar disorder for this later claimed time period.

in script, or make correct change. (T. 53). Hernandez stated that she had met with Brian's teachers and that he needed 1:1 attention and would be classified as "Other Health Impaired." (T. 134). In addition, Hernandez stated that Brian had friends his own age, but did not get along with her, other adults, or school teachers. (T. 55). She stated that he did not pick up his toys, help around the house, obey safety rules, or accept criticism or correction. (T. 56). Furthermore, she stated that Brian could keep busy with arts and crafts projects but that he did not finish the things he started, complete his homework, or complete chores most of the time. (T. 57).

At his hearing, Hernandez testified that Brian's biggest problems were his moods, attitude, learning, and forgetting things. (T. 214-15). She stated that in January 2004, Brian's medications were changed and he improved in his ability to learn and focus but that he still had "moods" even with the medication. (T. 216-217). Prior to his medication, Hernandez received calls from the school every other day regarding Brian's behavior. Id. She also testified that Brian was suspended three to four times for incidents such as throwing chairs. Id. She further stated that Brian had burned down a garage and had an incident with the police because he threw firecrackers at people on a beach. (T. 224-25). Additionally, Hernandez testified that Brian was attending both regular and special education classes, but that he passed sixth grade with

"D's". (T. 212-13). She also testified that he participated in a bowling league but that he could only remain focused on television for only fifteen minutes intervals. (T. 218-19, 224).

    B.   <u>School Evidence</u>

In September 2001, school psychologist, Isora-Cruz-Cardona ("Cardona") evaluated Brian by administering the Weschler Intelligence Scale for Children-Third Edition ("WISC-III"), Developmental Test of Visual Motor Integration ("VMI"), Woodcock-Johnson Tests of Achievement revised ("WJ-R"), Test of Auditory Processing Skills ("TAPS"), and the Conner Teacher Rating Scale. (T. 156-162). Cardona reported that Brian had a history of hearing loss, and that his first grade teacher reported that he had difficulty interacting with peers, problem solving, relating to adults, and significantly delayed reading and writing skills. (T. 156). Brian's second and third grade teachers reported that Brian needed a lot of one on one attention and suffered from behavioral difficulties. (T. 157).  Cardona also found Brian to have a full scale IQ of 75, a verbal IQ of 72, and a performance IQ of 82, placing him in the borderline range of cognitive functioning. (T. 157). She was able to determine on the WJ-R testing that Brian's grade equivalent for reading was 2.3, for writing was 3.1 and for mathematics 3.8 (T. 157-58). At the time of testing, Brian had just begun the 4th grade, although his age cohort was in the 5th grade. Thus, Cardona concluded that he was more than a year delayed in his

writing skills and more than two years delayed in his ability to read. Id. In addition, the results of the TAPS found that Brian's auditory processing skills were significantly impaired. (T. 160). The Conner Teacher Rating Scale suggested that Brian met the DSM-IV criteria for ADHD. Id. Cardona suggested a diagnosis of ADHD and recommended that Brian be classified as a student with a learning disability needing placement in an inclusion setting. (T. 161-162).

On October 22, 2001, Sadie Harring ("Harring"), a Certified School Social Worker, completed a counseling assessment for Brian (T. 92). Harring reported that Brian did not readily interact with peers, was easily frustrated, and lacked confidence in his abilities. (T. 92).

On October 22, 2001, Brian was again evaluated, this time for speech language delays. (T. 95-97). He was found to have moderate delays in receptive language and a mild expressive language delay. Id.

On October 22, 2001, teacher K. Varner reported that although Brian was outgoing, he tended to seclude himself, needed to have distractions minimized and directions shortened and repeated, and got easily frustrated. (T. 100-101).

On October 24, 2001, teacher C. Salvaggio reported that Brian was below average in basic concepts, social emotional skills, self-help skills, reading skills, and math skills but that his communication and motor skills were age appropriate. (T. 98). The

teacher continued to state "Brian has difficulty performing in group work. He lacks social skills and often becomes frustrated and violent." Id.

In February 2002, teacher M. Hess ("Hess") provided a Functional Behavorial Assessment, which listed Brian's refusal to work, his anti-social behavior, physical aggression and frequent easy distractibility as behavior areas of concern. (T. 108-109). Hess also noted Brian's areas of strength were his interpersonal skills and his sense of humor. (T. 108).

On February 5, 2002, Brian was evaluated by Wendy Irwin ("Irwin"), an occupational therapist. (T. 106-7). Irwin reported good graphomotor skills, good cutting skills and that Brian attempted all tasks presented to him and demonstrated adequate attention to all tasks. (T. 106).

On March 1, 2002, the Committee on Special Education ("CSE") met and reported that Brian tended to be isolated, was easily frustrated, unable to work in cooperative groups, could be aggressive, volatile and required behavior management. (T. 80). The CSE reported that Brian had been diagnosed with ADHD and was prescribed medication. (T. 76). The CSE decide to place Brian in a 12:1:1 classroom with speech therapy three times a week and a counseling session once a week. Id.

In January 2004, Brian's 6th grade special education teacher, L. Marrapese reported that Brian had a marked limitation in

learning, reading, and comprehending new material. (T. 146). She stated that without simplified directions, multiple examples, and extended time to complete assignments, Brian would "fall through the cracks and fail." (T. 150).

    C.    <u>Medical Evidence</u>

In April 2002, Brian began treatment for ADHD with depression and anger at the Rochester Mental Health Clinic after being referred there by the Jordan Mental Health Center. (T. 202). Brian had been seen at the Jordan Medical Health Center since June 1999 and diagnosed with ADHD for which he was prescribed Ritalin. (T. 170-177).

On July 10, 2002, after evaluation, Dr. Susan Feder ("Feder") stated that Brian suffered from ADHD and a mood disorder. Brian was taken off Ritalin because of mixed success with the drug and he was prescribed Concerta once a day. (T. 163-169).

On July 30, 2002, Brian was examined by Dr. Alan Dubro ("Dubro") at the Commissioner's request. (T. 180). Dubro stated that Brian had an irritable mood, constricted affect, impaired ability to maintain attention and concentration, impaired memory, and estimated borderline cognitive ability. (T. 180). He concluded that Brian had poor insight, poor judgment, and poor impulse control, but concluded that Brian did not suffer from ADHD but from a Conduct Disorder. (T. 181). Dubro opined that Brian had

significant difficulties in adequately maintaining appropriate social behavior. Id.

On August 4, 2002, Dr. Susan Feder, noted that Brian's energy was high and that his frustration tolerance fluctuated up and down. (T. 203).

On August 9, 2002, Dr. Jennifer Meyer, a state agency physician reviewed the medical evidence of record and noted that more information was needed about Brian's activities of daily living. (T. 183). She opined that if additional information was not forthcoming, Brian's claim should be denied because of insufficient information. (T. 184).

From August 14, 2002 through May 4, 2004, Brian consistently had a Global Assessment of Functioning Score ("GAF") between 50 and 60 and showed no real improvement despite treatment. (T. 193-207).

On September 26, 2002, Dr. Paulette Harr, another state agency physician reviewed the medical evidence of record, and indicated that the claim should be denied based upon insufficient evidence. (T. 184).

In July 2003, Dr. Feder prescribed Wellbutrin an anti-depressant for Brian. (T. 198).

In November 2003, Dr. Feder, discontinued his prescription of Concerta and instead prescribed Adderall to address Brian's continued symptomology. (T. 198).

On January 8, 2004, Seroquel was added to Brian's medication regime. (T. 198).

In early 2004 because of Brian's alternating depression and hyperactivity he was diagnosed with bipolar disorder. (T. 194, 207).

On August 20, 2004, Dr. Feder reported that Brian received individual therapy twice a month and pharmacological services for treatment of bipolar Disorder and ADHD. (T. 208). Feder reported that Brian displayed problematic symptoms that included sadness, inattention, difficulty concentrating, sleep disturbance, anger with aggressive tendencies and irritability. Id.

At the time of his hearing, Brian was taking Adderall for his ADHD, Wellbutrin for his depression, and Seroquel, an antipsychotic. (T. 198, 208).

## DISCUSSION

A.   Jurisdiction and Scope of Review.

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison

Co. v NLRB, 305 U.S. 197, 229 (1938). Section 405(g) thus limits the court's scope of review to determining whether or not the Commissioner's findings were supported by substantial evidence. See, Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that the reviewing court does not try a benefits case de novo). The court is also authorized to review the legal standards employed by the Commissioner in evaluating the plaintiff's claim. Finally, the court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F.Supp 265, 267 (S.D. Tex. 1983) (citation omitted).

B. Legal Standards for A Disabled Child's SSI Benefits

The regulations for determining disability for children is set forth in a three-step sequential evaluation process for determining whether a child meets this definition of disability. See 20 C.F.R. § 416.924 *et seq*. The first step of the evaluation process is to determine whether the child is working at a level of "substantial gainful activity." If the child is working, the claim is denied. If the child is not working, however, the claim proceeds to the second step of the evaluation. See 20 C.F.R. § 416.924 (b). At the second step, the Commissioner determines whether the child has a "severe" impairment. A "severe" impairment is defined as more than a "slight abnormality or combination of slight abnormalities" that cause more than minimal limitations. See 20 C.F.R. § 416.924 (c).

A claim that satisfies this *de minimis* standard proceeds to the third and final step, in which the Commissioner determines whether the child has an impairment or combination of impairments that "meet, medically equal, or functionally equal the severity of a set of criteria for an impairment in the listings...." 20 C.F.R. § 416.924 (d).

A child functionally equals a listed impairment if he or she has an "extreme" impairment in one of six areas of functioning, or a "marked" impairment in two of six areas of functioning. The areas of functioning to be considered are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting with and relating to others, (4) moving about and manipulating things, (5) self care, and (6) health and physical well being . 20 C.F.R. Sec. 416.926a(b)(1)(i-vi). An extreme impairment exists where the impairment seriously interferes with a person's ability to independently initiate, sustain, or complete activities. 20 C.F.R. 416.926a(ii)(3). A "marked impairment" is one that interferes with ones ability to independently initiate, sustain, or complete activities. 20 C.F.R. 416.926a(e)(ii)(2).

Here, the ALJ evaluated Brian's case in accordance with the Social Security Regulations. At step one of the sequential evaluation process, the ALJ found that Brian, only twelve years old was not working at a level of "substantial gainful activity." At step two, the ALJ found that Brian had severe impairments, namely,

bipolar disorder, ADHD, and asthma. At step three, the ALJ, found that these impairments did not meet, medically equal, or functionally equal the criteria of the Social Security Listings. (T. 15-21). In terms of functional equivalence, the ALJ found that Brian had a marked limitation in the domains of acquiring and using information; less than marked limitations in the domains of attending and completing tasks and of interacting with others; and no limitations in the domains of moving about and manipulating objects, caring for himself, or health and physical well being. (T. 22). Because the ALJ only found one marked limitation and not two, he concluded that Brian was not disabled. The Commissioner maintains that this decision was supported by substantial evidence. The plaintiff contends that the ALJ erred because her son suffers from at least two marked limitations as a result of his Attention Deficit Hyperactivity Disorder ("ADHD"), bipolar disorder with depressed mood, and borderline IQ, thus her son is disabled within the meaning of the Social Security Regulations.

In the instant case, I find that Brian suffers from two marked impairments in the areas of: 1) acquiring and using information; and 2) attending to and completing tasks. In fact, it is undisputed by both parties and the ALJ that Brian suffers from a marked impairment in acquiring and using information.

Similarly, I find that Brian suffers from a marked impairment with respect to attending to and completing tasks. According to the

Social Security Regulations, when evaluating the "domain of attending and completing tasks" the Commissioner will consider "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). A child in Brian's age group is expected to be able to focus attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments, concentrate on details and not make careless mistakes in work (beyond what would be expected in other children of the same age who do not have impairments.) Furthermore, a school age child should also be able to change activities or routines without distracting himself or others, and stay on task and in place when appropriate, as well as be able to sustain attention well enough to participate in group sports, read by himself, and complete family chores. He should be able to complete a transition task without extra reminders and accommodation. 20 C.F.R. § 416.926a(h)(2)(iv).

Here, the record is replete with references to the difficulties Brian experiences with attending to and completing tasks. Brian's treating psychiatrist, Dr. Feder observed that he had difficulty sustaining attention at an age appropriate level and that he "displayed problematic symptoms that included...inattention, difficulty concentrating." (T. 167, 208). Dr. Dubro stated that

Brian had an impaired ability to maintain attention and concentration, poor insight, poor judgment, and poor impulse control. (T. 180-1). Teacher K. Varner reported that Brian needed to have distractions minimized, directions shortened and repeated. (T. 100-01). Teacher M. Hess provided a Functional Behavorial Assessment, which listed Brian's refusal to work, his anti-social behavior, physical aggression and frequent easy distractibility as behaviors of concern. (T. 108-09). Teacher L. Marrapes reported that without simplified directions, multiple examples, and extended time to complete assignments, Brian would "fall through the cracks and fail." (T. 150). Furthermore, Hernandez, Brian's mother testified that he can only remain focused on TV for about 15 minutes, but even then he would be jumping at the same time and that he did not finish the things he started, complete his homework, or complete chores. (T. 57, 224). Therefore based on the evidence set forth in the record, I find that Brian has a marked impairment with respect to attending to and completing tasks.

Thus, because the substantial evidence contained in the record reflects that Brian has two marked impairments, he is considered disabled according to the Social Security Regulations.

## CONCLUSION

For the reasons set forth above, I find that the substantial evidence in the record supports a finding that Brian Saez-Hernandez is disabled. Accordingly, the decision of the Commissioner denying the plaintiff's application for Social Security benefits is reversed, the plaintiffs' motion for judgment on the pleadings is

granted, the defendant's motion for judgment on the pleadings is denied. The action is remanded to the Commissioner of Social Security for immediate calculation and payment of benefits.

    ALL OF THE ABOVE IS SO ORDERED.

                              S/ Michael A. Telesca
                              _____
                                  MICHAEL A. TELESCA
                              United States District Judge

DATED:    Rochester, New York
           June 1, 2006